**Opinion issued October 17, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-00529-CV

————————————

**THE PETERSON GROUP, INC., PGI DEVELOPMENT GROUP, L.P., AND WELLINGTON YU, Appellants**

**V.**

**PLTQ LOTUS GROUP, L.P. AND CUBO GROUP, L.L.C., Appellees**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2006-36672**

---

### DISSENTING OPINION

I respectfully dissent. This case presents important issues regarding the economic loss doctrine and alter ego theory. The majority's holdings (1) seriously undermine the economic loss doctrine by permitting the double recovery of

damages in both fraud and contract for losses expressly covered by the terms of the contract and (2) radically change Texas alter-ego law by holding that alter-ego theory does not apply to pierce the corporate veil shielding a person or entity from liability through corporate entities formed as mere business conduits so long as the entity in which liability is ultimately lodged is a phantom limited partnership. I would restate the facts to encompass facts omitted by the majority that I believe are material to the proper disposition of this case, and I would restate the law. I would affirm in part and reverse in part on different grounds from those asserted by the majority, and I would remand the case to the trial court for proceedings consistent with this opinion.

This is an appeal from a judgment after a jury trial in a case arising from two real estate transactions. Appellants, the Peterson Group, Inc. ("the Peterson Group"), PGI Development Group, LP ("PGI"), and Wellington Yu (collectively, "the Developers"), sued appellees, PLTQ Lotus Group, L.P. and Cubo Group, L.L.C. (collectively, "PLTQ"), for money due under a purchase agreement, a promissory note, and a real estate development agreement. PLTQ argued that it had fully satisfied its debts to the Developers and countersued for breach of the development agreement and fraud in connection with the real estate development project. PLTQ also argued that the Peterson Group and Yu were alter egos of PGI, the limited partnership that was party to the development agreement.

2

The jury found for PLTQ and against the Peterson Group and Yu on PLTQ's fraud claim. The jury also found for PLTQ against PGI on PLTQ's breach of contract claim. After multiple post-trial motions, the trial court issued a final judgment on the verdict. The court also found in the judgment, after various rulings before and after trial, in which it vacillated on the issue, that the Peterson Group and Yu were alter egos of PGI. The court awarded damages found by the jury against the Peterson Group and Yu on PLTQ's fraud cause of action, plus pre- and post-judgment interest. The Peterson Group and Yu were also held jointly liable with PGI as alter egos of PGI on PLTQ's breach of contract claim against PGI, and they were held liable for pre- and post-judgment interest on that claim. Finally, the trial court awarded PLTQ its attorney's fees in a stipulated amount.

In five issues, the Developers: (1) challenge the trial court's ruling that the Peterson Group and Yu are alter egos of PGI; (2) challenge the trial court's award of attorney's fees against the Peterson Group and Yu; (3) argue that PLTQ's fraud claim is barred by the economic loss rule; (4) argue, alternatively, that PLTQ was required to elect a remedy between fraud and breach of contract; and (5) contend that the trial court should have granted their motion for judgment notwithstanding the verdict ("JNOV") as to breach-of-contract damages for lost tenant rent because such damages were too speculative to have been awarded.

Contrary to the majority, I would hold that PLTQ's fraud claim is barred by the economic loss rule. I would also hold that, although the trial court erred by failing to require PLTQ to elect a remedy between fraud and breach of contract, that issue is moot. I would further hold that the damages awarded PLTQ for lost tenant rent were speculative and, therefore, not recoverable. I would reverse the trial court's judgment as to the foregoing claims and as to pre- and post-judgment interest on them. I would affirm the unchallenged judgment as to PLTQ's other contract claims against PGI, and I would affirm the trial court's finding in the final judgment that the Peterson Group and Yu are alter egos of PGI and therefore liable for payment of damages awarded to PLTQ on PLTQ's contract claims. Finding PLTQ's fraud and contract claims to be inextricably intertwined, I would also affirm the trial court's award of stipulated attorney's fees to PLTQ. Accordingly, I would affirm the judgment in part and reverse in part and remand the case for further proceedings in accordance with this opinion.

**Background**

In the spring of 2003, Dr. Loi Nguyen, a practicing cardiologist, formed PLTQ Lotus Group, L.P., for the purpose of investing in and developing real estate. Cubo Group, LLC is the general partner of PLTQ Lotus Group, and Nguyen is the president of Cubo Group. Nguyen purchased land in Houston with a loan from First Bank with the intention of building a medical center where his

4

office would be located.  Jaclyn Nguyen, Nguyen's former wife and a real estate agent, introduced Nguyen to Yu.  Yu is a real estate developer who develops shopping centers in the Houston suburbs.  Yu conducts his real-estate development work primarily through his company, the Peterson Group.

Yu persuaded Nguyen to purchase two additional acres adjoining the land Nguyen had already purchased for the medical center and to develop the land instead as a shopping center.  Yu arranged for Nguyen to obtain a construction loan from Metro Bank, which was used to satisfy Nguyen's loan from First Bank for the purchase of the property and to fund the purchase of the additional two acres.  The Metro Bank loan was also to cover the cost of developing the property into a shopping center, which Yu and Nguyen called the Royal Oaks Shopping Center ("the Project").  Pursuant to the Metro Bank loan, Nguyen maintained a construction account at Metro Bank to fund construction of the Project.

### 1. The Royal Oaks Development Agreement

In February 2004, Yu formed a special purpose limited partnership, PGI, for the sole purpose of developing the Royal Oaks Shopping Center.  He also formed Peterson I Realty GP, Inc. ("Peterson I Realty") to be the general partner of PGI.  Peterson I Realty filed articles of incorporation on February 4, 2004.  Yu was the sole director.  PGI filed a certificate of limited partnership on February 27, 2004, designating Peterson I Realty as its general partner.  Yu signed the certificate of

5

limited partnership as the president; no person or entity was identified as a limited partner. Yu is, thus, the sole partner and employee of PGI, the special purpose entity he formed to develop the Project; the sole shareholder and president of Peterson I Realty, which he formed to be the general partner of PGI; and the sole shareholder, president, and employee of the Peterson Group, his development company. The Peterson Group has an office, and Yu works there for both the Peterson Group and PGI. PGI has no office or bank account of its own.

The Peterson Group and PLTQ entered into a development agreement for development of the Royal Oaks Shopping Center on November 13, 2003. This one-page agreement established that the Peterson Group, as the developer, would be responsible for the following activities:

1. Negotiate the purchase of the Land
2. Designing/engineering/Obtaining construction permits
3. Leasing of shopping center
4. Construction
5. Assist in obtaining bank loan financing
6. Accounting on the cost of the project
7. Oversee Tenant move-in and construction

PLTQ was to be responsible for "pay[ing] all costs associate[d] with the development activity on a timely basis" and for "compensat[ing] the developer, Peterson Group, [with a] development fee of $250,000 for Phase I and $400,000 for Phase II," in five installments beginning with a 20% payment at the start of the

construction. The contract was signed by Nguyen as president of PLTQ and Yu as president of the Peterson Group.

The next day, Yu and Nguyen signed a second development agreement for the Project ("the Royal Oaks Development Agreement"). This contract was between PLTQ Lotus Group, identified as "the 'Client,'" and PGI, identified as "the 'Developer.'" This agreement, which was entered into on the advice of Yu's attorney, more thoroughly described the Developer's duties and replaced the Peterson Group with PGI as the Developer. By its terms, this agreement superseded the development agreement of the previous day.

Paragraph 2(a) of the Royal Oaks Development Agreement provided that PGI would: (i) research local market conditions; (ii) perform due diligence regarding utilities, accessories, and zoning for the Project; (iii) advise PLTQ on due diligence for the property associated with the Project, supervise its acquisition, and obtain financing for the Project; (iv) apply for and obtain all necessary permits and licenses; (v) engage, at the expense of PLTQ, all architects, contractors, engineers, designers, and other professionals deemed necessary or appropriate by PGI for the "design, construction, and development of the Project"; (vi) negotiate and enter into, on behalf of and in the name of PLTQ, "all contracts and other agreements (including loan documents, which shall be executed only by the Client) necessary or desirable for the design, construction, and development of the

Project"; (vii) cause the architect to prepare plans and specifications to be approved by PLTQ; (viii) "provide a plan for completion of various portions of the work"; (ix) prepare and submit to PLTQ an estimate of expenditures at least every sixty days; (x) review invoices from contractors to verify completion of the work and delivery of materials; (xi) purchase, in the name of PLTQ and at its expense, "all furnishings, fixtures, and equipment for the Project and supervise its installation"; and (xii) "[p]repare and submit all draw requests copies of which shall be provided to and approved by the Client [PLTQ] to the lender of the construction loan for the Project [Metro Bank] and receive the funds advanced thereunder and deposit such funds in an account established and maintained by the client at a bank designated" by PLTQ.

Paragraph 2(b) of the Royal Oaks Development Agreement provided for PGI to oversee the leasing of the Project. Paragraph 2(c) provided that PGI would "[o]versee the construction of tenant improvements and tenant move-in in connection with the initial leasing of any space in the Project." Paragraph 2(d) provided that PGI would advise PLTQ promptly of material developments concerning design, construction, and financing. Paragraph 2(e) provided for PGI to "[d]o all other things, in the name of and at the expense of [PLTQ] necessary or desirable in the reasonable judgment of Developer to cause 'final completion' . . . of the Project to occur."

Paragraph 3 of the Royal Oaks Development Agreement granted PGI "all authority necessary to carry out its responsibilities under this Agreement" and required PLTQ to provide such written confirmation of that authority at PGI's request, except that PGI was not authorized to "take any action to cause [PLTQ] to incur any indebtedness" or to take any action to cause PLTQ to sell all or part of the property associated with the Project.

Paragraph 4 provided for the payment of the Development Fee in installments in the amount of $250,000 for Phase I and $400,000 for Phase II. Paragraph 6 affirmed that this was an "arm's length" transaction and that a professional standard of care in accordance with community standards applied. The Royal Oaks Development Agreement also included a limitation of liability provision:

> 8. <u>Limitation of Liability</u>. No member, manager, officer, stockholder, employee, agent or representative of the Client [PLTQ] shall be personally liable hereunder, all such liability being limited to the assets of the client. *No member, manager, officer, stockholder, employee, agent or representative of the Developer [PGI] shall be personally liable hereunder*, all such liability being limited to the assets of the Developer [PGI].

(Emphasis added.)

This contract was executed on behalf of PLTQ by Nguyen, identified in the signature block as president of Cubo Group, the general partner of PLTQ, and on

9

behalf of PGI by Peterson I Realty, the general partner of PGI. Yu signed for Peterson I Realty as its president.

## 2. *Amendment to the Royal Oaks Development Agreement II*

Yu began developing the Royal Oaks Shopping Center. By the summer of 2004, he had become frustrated with both Nguyen's unavailability and the Royal Oaks Project itself, which Yu felt was occupying too much of his time at the expense of his own development projects.

In June 2004, the parties signed an "Amendment to Development Agreement" ("the Amendment") in the same capacities as before. The Development Fee was increased to the lesser of $770,000 or 11% of the total project cost. The amendment also provided that PLTQ would add Yu as an authorized signatory for the Project's disbursement account at Metro Bank, and it authorized Yu to pay reasonable and necessary development costs from the account "including, without limitation, the Development Fee." It further provided for PLTQ to indemnify Yu, PGI, and Peterson I Realty for any liabilities, costs, or expenses, including attorney's fees, incurred as a result of any actions taken by PGI pursuant to the authority granted in the Royal Oaks Development Agreement.

Specifically, the Amendment provided:

As soon as practicable following the execution of this Agreement, Client [PLTQ] shall cause Wellington D. Yu to be added as an authorized signatory for the Project's disbursement account with Metro Bank. *Developer [PGI] is hereby authorized to pay from such*

10

*account (or any replacement account) any and all costs and expenses which are necessary or desirable in Developer's reasonable discretion in connection with the design, development, marketing, and/or leasing of the Project (including, without limitation, the Development Fee,* subject to the requirements of Section 1 above). Client [PLTQ] shall be solely responsible for any amounts incurred by Developer [PGI] pursuant to the authority granted hereunder (regardless of whether sufficient funds are maintained in the Project bank account(s)), and *Client hereby agrees to indemnify, defend and hold harmless Developer Parties (as defined in the Development Agreement) from and against any and all liabilities, losses, damages, costs or expenses (including reasonable attorneys' fees) incurred by any Developer Party as a result of actions taken by Developer pursuant to the authority granted herein.* This Section 2 may be relied on by any third party as evidence of Developer's authority to incur costs in connection with the Project at Owner's expense as set forth above.

(Emphasis added.) The "Developer Parties" referenced in the Amendment were not defined in the Royal Oaks Development Agreement.

### 3. The Stonegate Contract

Shortly after Nguyen purchased the additional two acres for the Royal Oaks Project, Yu showed Nguyen some land that he was developing as a strip center near Stonegate Commons, a residential development on the northwest side of Houston near Barker-Cypress and Highway 290. Yu owned two acres of land there that he intended to develop, and he had a contract to purchase an additional eight acres adjacent to the land. Yu persuaded Nguyen to buy six of those acres after Yu assured him that they could structure the purchase agreement so that Nguyen would not have to make a cash down payment.

11

In August 2003, Nguyen signed a purchase agreement, the "Stonegate Contract," which provided that the prevailing party might recover attorney's fees in an action to enforce or interpret the contract:

> 11.15.  Attorney's Fees.  If any action at law or in equity becomes necessary to enforce or interpret any term, provision or condition of this Contract, the prevailing party shall be entitled to recover the reasonable attorney's fees, costs, and necessary disbursements (including, but not limited to, expert witness fees and deposition costs) incurred or made by it in addition to any other relief to which it may become entitled.

Yu and the Peterson Group would later contend that Nguyen owed them $730,000 on this transaction.

### 4.  *Development of the Royal Oaks Project*

In July 2004, PLTQ entered into a contract with Atlantic Builder Company and an architect, Consolidated Architectural and Planning Service ("CAPS"), for construction of the Royal Oaks Shopping Center.  PLTQ was listed as the owner of the property on the construction contract, and Atlantic Builder and the Peterson Group were listed as construction managers.  D. W. Tan is an architect, the president of CAPS, and the vice-president of Atlantic Builder.  Tan testified that his construction contract was with the Peterson Group.  The Peterson Group did not do any of the construction management work, but Tan listed it on the contract because they had worked successfully together in the past.  He had never heard of PGI.

In accordance with its contractual duties under the Royal Oaks Development Agreement, PGI worked at developing the shopping center through Yu. It obtained and worked with Tan's architectural firm to design the center, with Tan's construction company to build it, and with a real estate broker, Jaclyn Nguyen, to find tenants. Yu also located several tenants for the center through his personal contacts.

The Amendment to the Royal Oaks Development Agreement had also provided that the Development Fee was to be taken from the construction loan. Yu testified that Nguyen wanted him to take the Development Fee from the construction loan because he felt the Development Fee was part of the total cost of construction. Although Nguyen contended at trial that he was surprised by the accounting practices employed on this project, Nguyen testified that he wanted the Development Fee included in the construction loan. However, he learned after signing the loan paperwork that Metro Bank would not permit that. Because the bank did not want to include the Development Fee in the cost of the loan, Yu marked up the cost of construction to take the fee out of the bank loan anyway. Yu also solicited and received payments directly from Nguyen during the same time period to cover development costs, as contemplated by the Royal Oaks Development Agreement.

During construction, Tan submitted draw requests directly to Metro Bank to obtain money from Nguyen's construction loan. When he received money from the bank, he would deliver it to Yu or his representative, and Yu would give him checks for his fee and to pay the subcontractors. Tan testified that it was his and Yu's practice to inflate the amount of the draw requests above the actual Metro Bank construction costs. According to Tan, the total amount of money withdrawn from the construction loan was approximately $900,000 in excess of actual construction costs. Tan testified that at one point, Yu asked him to prepare a false change order to submit to the bank in order to obtain an additional $400,000 in financing. Although Tan knew the change order was false, he "reluctantly" prepared it anyway.

On March 30, 2005, Yu sent Nguyen a letter on PGI letterhead informing him of a $633,965 shortfall in funds to satisfy the construction costs. In the letter, Yu reminded Nguyen of his financial obligations regarding the project, stating, "An enormous amount of time and money has been spent to date in hopes of making this project a success, and you have made commitments to prospective tenants and contractors (including PGI Development Group) under various project-related leases and other contracts." Nguyen hand wrote a note on the bottom of the letter agreeing to contribute an additional $600,000 in three installments: April 2005, midway through construction, and upon completion of construction. The

note roughly reflected the agreement reached in the Royal Oaks Development Agreement that PLTQ would be responsible for paying all costs associated with the development on a timely basis in five increments, including an initial payment at the start of construction and a final payment upon completion of the Project. The record also included copies of applications for payment submitted to Metro Bank on the Project, and construction status reports with photographs. On June 29, 2005, Nguyen and Yu both signed a document approving an additional $400,000 in construction costs "based on Dr. Nguyen and Mr. Yu's request of changes."

By the end of 2005, the shell of the Royal Oaks Shopping Center was completed and ready for custom build-out by tenants who had been secured for the property. Initially, the center was fully leased, with several restaurants, a coffee shop, a martini bar, and a check cashing company prepared to build out spaces in the center. However, there were a number of delays and problems, including Hurricane Katrina, tenant issues, and workmanship issues by the builder. Jaclyn Nguyen, who had been working as the property manager, was not collecting the rent due under the leases. Some tenants had financial problems, including bankruptcy, and their ability to pay the rent required by the leases became questionable. Construction defects became apparent as tenants readied their spaces, but, rather than seeking to have the builder repair the defects, Yu authorized the tenants to remedy the defects and charge the costs to PLTQ. To this

end, Yu told Nguyen that another $1 million was required to complete the repairs and custom tenant build-outs.

In February 2006, Metro Bank sent Nguyen a letter informing him that his "project costs will . . . overrun [the] loan balance by $295,391" as of the date of the letter. The letter continued:

> This is assuming that you can control your tenants' build-out cost to finish the project.

> We think this is a critical situation on your project. Additional equity injection is required from you to assure the project can be continued to finish without interruption.

By this point, frustrated with delays, cost overruns, and a lack of transparency as to how his money was spent, Nguyen became more involved in the project. The day he received the letter from Metro Bank about the costs exceeding his loan, Nguyen dismissed Jaclyn and sent Yu a letter addressed to "Peterson Group, Inc.," demanding an accounting of the Project and seeking other information and documentation. Tan had no contact with Nguyen during design and construction of the shopping center. Only after construction was finished did Nguyen inquire about the use of the construction loan. Tan showed him the accounting information he had and explained that he had submitted draws to the bank, within the amount of the bank loan, which exceeded the actual construction costs.

16

Nguyen began to take over the making of business decisions from Yu. When the parking lot was eight spaces short, PGI suggested a plan for creating more parking, but Nguyen, instead, canceled one of the restaurant's leases. Yu worked with the owner of the bar to devise a menu that would satisfy the Texas Alcoholic Beverage Commission ("TABC"), which had refused a bar license, but Nguyen cancelled that lease too. Because of these contrary decisions, after the shell of the project was complete, Yu informed Nguyen that he was leaving the Project, but he demanded payment of the remaining portion of the Development Fee.

After Yu left the Project, Nguyen locked four tenants out of the center immediately prior to their taking occupancy for failure to pay rent. Although some eventually returned, most of the original tenants either went out of business or had their leases terminated by Nguyen.

### 5. *The Lawsuit*

The Peterson Group and PGI sued PLTQ for breach of the Royal Oaks Development Agreement and breach of the Stonegate Contract. They sought attorney's fees under Civil Practice and Remedies Code section 38.001 for both contract claims.

PLTQ answered and pleaded several affirmative defenses. PLTQ filed a counterclaim and third-party petition against Yu and others who are not involved

in this appeal. PLTQ alleged that Yu and the Peterson Group were alter egos of each other. It sued Yu, the Peterson Group, and PGI for fraud. It alleged that Yu, on his own behalf and on behalf of the Peterson Group and PGI, made material misrepresentations "regarding the services he and his companies would provide in developing the Royal Oaks Center." PLTQ alleged that Yu misrepresented that he and his entities would develop the shopping center and perform the tasks enumerated in the Royal Oaks Development Agreement. PLTQ further alleged that Yu made misrepresentations as work on the shopping center progressed, specifically in regard to monitoring the construction loan and using the funds only for construction of the center. PLTQ alleged that Yu "intentionally took draws against the construction loan for unauthorized expenses not related to Royal Oaks" and that Yu "knew and intended that PLTQ rely upon his representations of honesty and trustworthiness and PLTQ did rely upon same" and suffered "financial damage as a result of Yu's treachery." PLTQ also pleaded a cause of action for breach of the Royal Oaks Development Agreement, saying that the Agreement set out the duties of Yu, the Peterson Group, and PGI, which each failed to perform. PLTQ also sued Peterson I Realty, the general partner of PGI, but it later dropped this party from its pleadings. PLTQ sought a declaratory judgment that Yu, the Peterson Group, and PGI were all alter egos of each other.

18

Throughout the litigation, PLTQ raised the issue of which person or entity— the Peterson Group, Yu, or PGI—had actually done the work on the Royal Oaks Project. Some documents showed the involvement of the Peterson Group, such as a document prepared by a commercial broker and addressed to the Peterson Group. Nguyen wrote checks both to "Peterson Group" and directly to Yu, including one to Yu dated April 4, 2005, for $100,000 with a notation reading, "Development Fee 2nd Draw." Other parties, like Tan, believed they were working with the Peterson Group. At trial, Yu testified that he was the sole employee of the Peterson Group and of PGI, and, because he does not wear a uniform, when he is on a worksite there is no way for others to determine whether he is working for the Peterson Group or for PGI.

With respect to the provision in the Royal Oaks Development Agreement limiting the Developer's liability to PLTQ solely to PGI, which lacked even a bank account, Yu testified that he did not believe PGI needed a bank account: "[S]ince I do not sign on Dr. Nguyen's checking account, I do not touch his money, I do not touch his loan money from Metro Bank, so, only a few checks that was going to pay from Dr. Nguyen to myself for a development fee."

Nguyen testified about his damages. He disagreed with Yu's method of calculating the Development Fee based on the Amendment to the Development Agreement providing for Yu to earn 11% of the Project cost, payable in

19

installments. Nguyen disagreed that items such as interest on the loan should be included in the cost that formed the basis for Yu's 11% fee because doing so created an incentive for delay. Likewise, Nguyen thought that including excessive tenant build-out costs, which were approved by Yu, created a disincentive for managing costs because high tenant build-out costs would increase the Development Fee. However, Nguyen conceded that, at the time he entered into the Royal Oaks Development Agreement and its Amendment, he understood that the Development Fee would be based on Project costs, including tenant build-out costs.

Nguyen testified that he was not seeking a total refund of the Development Fee. He testified that Yu accomplished some of the Project's goals, and he indicated that he was satisfied with some of the tenants that Yu secured for the Project. However, Nguyen testified that he was seeking reimbursement of the "extra" money Yu charged. Nguyen said, "Whatever he didn't earn he should return to me." Nguyen testified that he was seeking the following other elements of damages in addition to the excessive Development Fee: (1) lost rent money; (2) lost tenant build-out money; (3) additional cash that he was required to provide either to satisfy bank loan requirements or Project obligations; (4) the cost of employing a new contractor to repair construction defects; (5) commissions for leases on businesses that never opened or that closed shortly after opening; and

(6) payment of a lien on behalf of an anticipated tenant that filed for bankruptcy. He also testified that he had borrowed against his life insurance and had withdrawn money from his retirement account to pay for Project expenses, but he was unable to quantify a value of money lost by taking those actions.

## 6. Disposition Below

Following trial, the case was submitted to the jury. In response to Questions One through Six, the jury found that PLTQ failed to comply with the terms of the Promissory Note issued by Metro Bank with respect to the Stonegate Contract, but that its failure to comply was excused because "a different performance was accepted as full satisfaction of performance of the original obligations of the agreement" and because compliance was waived by the Peterson Group. Thus, the jury did not award the Peterson Group damages on its breach of contract claim against PLTQ with respect to the Stonegate Contract.

In Questions Seven through Nine, the jury found that PLTQ did not fail to comply with the Royal Oaks Development Agreement.

In Questions Ten and Eleven, the jury found that Yu and the Peterson Group committed fraud against PLTQ, attributing 5% of the fraud to Yu and 95% of the fraud to the Peterson Group. The jury was instructed to consider only one element of damages as to fraud, which was: "Money used without PLTQ's knowledge or consent and not for PLTQ's direct or indirect benefit." The jury also found, in

response to Question Thirteen, that none of the Developers—Yu, the Peterson Group, or PGI—induced PLTQ to enter into the Royal Oaks Development Agreement by fraud. The jury awarded PLTQ Lotus Group $184,000 for fraud, plus pre- and post-judgment interest on PLTQ's fraud claim.

The jury found, in response to Question Seventeen, that PGI failed to comply with the Royal Oaks Development Agreement. The question for contract damages was granulated. In response to Question Eighteen, the jury awarded PLTQ the following sums as damages for PGI's breach of contract: $158,000 for "[m]oney paid to tenants for build-outs in excess of what was agreed to under their leases or otherwise agreed to by PLTQ"; $53,000 for "[m]oney PLTQ paid to tenant subcontractors as a result of workman liens or threatened liens"; $48,000 for "[t]he reasonable and necessary cost to repair [construction] work . . . at the Royal Oaks Shopping Center"; and $136,021 for "[l]oss of tenant rent in the past that it would have received had the agreement been performed." The jury awarded no damages on the following elements of damages: "[b]roker fees paid by PLTQ in excess of fees that would have been paid had the agreement been performed"; "[l]oan interest paid by PLTQ in excess of interest that would have been paid had the agreement been performed"; "[l]oss of tenant rent in the future that it would receive had the agreement been performed"; and "[m]oney withdrawn from the Royal Oaks construction loan that PLTQ would not have had to pay had the

22

agreement been performed." The contract damages awarded to PLTQ amounted to $395,996 plus attorney's fees in a stipulated amount and pre- and post-judgment interest.

After trial, the process of reaching a final judgment took over a year and resulted in three final judgments. Prior to entry of judgment, the trial court denied the Developers' motion for a directed verdict on fraud under the economic loss rule and on the speculative nature of lost tenant rent. PLTQ then moved for entry of judgment on the verdict, arguing that it did not have to elect a remedy between breach of contract and fraud. The court ruled that PLTQ was not required to elect a remedy.

The trial court rejected PLTQ's newly raised arguments that, under the Texas Limited Partnership Act, reverse piercing theory, and single business enterprise theory, the Peterson Group and Yu were responsible for damages found against PGI; it ruled that it would not extend liability beyond PGI for breach of contract.

After unsuccessful mediation, PLTQ submitted a new proposed judgment in which it requested attorney's fees against both PGI and the Peterson Group, on the ground that it was a "prevailing party" under the terms of the Stonegate Contract. Because this ground of recovery had not been pled, PLTQ moved for leave to amend its answer post-trial. PLTQ's motion for attorney's fees under the

23

"prevailing party" provision in the Stonegate Contract was not ruled on, and PLTQ did not file a post-trial amended answer seeking such fees.

On January 20, 2010, the trial court entered judgment, mistakenly signing PLTQ's September 2009 proposed judgment instead of its December 2009 proposed judgment, which failed to reflect the relevant post-trial rulings. The Developers moved to correct the judgment, and PLTQ asked the court to revisit its prior rulings that the Peterson Group and Yu were not alter egos of PGI. In a second judgment, the trial court purported to reinstate its prior directed verdict on this point, but actually broadened it to include Yu as well as the Peterson Group. The Developers moved again for a corrected judgment.

In its third and final judgment, from which this appeal is taken, the trial court ruled as a matter of law that the Peterson Group and Yu were alter egos of PGI. The court entered judgment on the verdict as to PLTQ's fraud cause of action in favor of PLTQ and against the Peterson Group and Yu. Likewise, the court entered judgment on the verdict in favor of PLTQ and against PGI, the Peterson Group, and Yu on PLTQ's breach of contract claim with respect to the Royal Oaks Development Agreement. The court also awarded PLTQ attorney's fees on this claim against PGI, the Peterson Group, and Yu. The court also awarded PLTQ pre- and post-judgment interest on both its fraud claim and its contract claim under the Royal Oaks Development Agreement.

The Developers appeal.

## Economic Loss Rule

In their third issue, the Developers argue that PLTQ's fraud claim is barred by the economic loss rule because it arose from a breach of duties established by the Royal Oaks Development Agreement between PGI and PLTQ. The Developers thus contend that the trial court erred by denying their motions for directed verdict and JNOV on PLTQ's fraud claim. I agree with the Developers that PLTQ's fraud claim is barred by the economic loss rule.

A trial court may disregard a jury's findings and grant a motion for JNOV only when a directed verdict would have been proper. TEX. R. CIV. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *see Prudential Ins. Co. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). JNOV should be granted when a legal principle precludes recovery. *See B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Here, the Developers allege that the economic loss rule precludes PLTQ's recovery for fraud because the damages awarded to PLTQ for fraud are the same economic damages awarded to it for breach of contract.

The economic loss rule provides that "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract

25

alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). In 2011, the Texas Supreme Court clarified the rule, stating, in relevant part:

> [I]n [*Jim Walter Homes*], we examined the difference between contract duties and tort duties arising under contractual relationships. That case involved a claim by homeowners against their builder, and we had to decide whether an independent tort supported an award of exemplary damages against the builder. *Jim Walter Homes*, 711 S.W.2d at 617. Because the injury resulted from negligent construction, we held that such disappointed expectations could "only be characterized as a breach of contract, and breach of contract cannot support recovery of exemplary damages." *Id.* at 618.
>
> Relying on the tort and contract distinctions articulated in *Jim Walter Homes*, we again applied the economic loss rule in *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991). In that case, we considered "whether a cause of action for negligence is stated by an allegation that a telephone company negligently failed to perform its contract to publish a Yellow Pages advertisement." *DeLanney*, 809 S.W.2d at 493. We held that, because the plaintiff sought damages for breach of a duty created under contract, as opposed to a duty imposed by law, tort damages were unavailable. *Id.* at 494.

*Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 417 (Tex. 2011).

The court further explained:

> [T]he acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.

*Id.* at 417 (quoting *DeLanney*, 809 S.W.2d at 495 and *Jim Walter Homes*, 711 S.W.2d at 618). The court distinguished damages due to torts like fraudulent inducement and tortious interference from damages due to breach of contract on

the ground that such causes of action cause economic injuries different from those caused by breach; they are, therefore, not barred by the economic loss rule. *See id.* at 418–19.

I would hold that the economic loss rule clearly applies in this case.

The jury found, in Questions Ten and Eleven, that Yu and the Peterson Group committed fraud against PLTQ, which it attributed 5% to Yu and 95% to the Peterson Group. The jury was instructed that fraud occurs when a party makes a material misrepresentation with the intention that it be acted on by the other party who relies on the misrepresentation and "thereby suffers injury." It was further instructed to consider only one element of damages as to fraud: "Money used without PLTQ's knowledge or consent and not for PLTQ's direct or indirect benefit." However, the jury also found, in Question Thirteen, that neither Yu nor the Peterson Group nor PGI fraudulently induced PLTQ to enter into the Royal Oaks Development Agreement.

In response to Question Seventeen, concerning breach of the Royal Oaks Development Agreement, which asked only whether PGI failed to comply with the Agreement, the jury answered "yes." There was no instruction on the elements of breach of contract or on damages available for breach. Instead, Question Eighteen simply asked the jury to award a specific amount of money for each of eight enumerated "elements of damages": (a) money paid by PLTQ to tenants for build-

27

outs in excess of amounts agreed to under their leases or otherwise agreed to by PLTQ; (b) "[m]oney PLTQ paid to tenant subcontractors as a result of workman liens or threatened liens"; (c) reasonable and necessary costs to repair work performed by Tan's construction company at the Royal Oaks Shopping Center; (d) "[b]roker fees paid by PLTQ in excess of fees that would have been paid had the agreement been performed"; (e) interest on loans paid by PLTQ in excess of interest that would have been paid had the agreement been performed; (f) loss of past tenant rent that PLTQ would have received had the agreement been performed; (g) loss of future tenant rent that PLTQ would have received had the agreement been performed; and (h) "[m]oney withdrawn from the Royal Oaks construction loan that PLTQ would not have had to pay had the agreement been performed." The jury awarded damages with respect to (a), (b), (c), and (f). It awarded no damages with respect to (d), (e), (g), and (h).

PLTQ contended that "Peterson covertly spearheaded the theft of the funds" by encouraging Atlantic Builders and Tan to submit false bank draws on PLTQ's loan account and that this constituted fraud as opposed to breach of contract. The evidence shows, however, that the funds PLTQ contends were "stolen" were funds drawn from Metro Bank under the Metro Bank loan and used either for development expenses or for the payment of Yu's Development Fee—both of

28

which were expressly contractually agreed to by PLTQ in the Royal Oaks Development Agreement and the Amendment.

The majority concedes that, as to breach of contract, PLTQ sought to recover sums of money paid toward the development of the Royal Oaks Shopping Center that it would not have had to pay if the agreement had been performed, "such as excess tenant build-out costs, money paid to tenant subcontractors to satisfy workman liens or avoid the imposition of liens, and the reasonable and necessary costs to repair work performed by Atlantic." Slip Op. at 32. It distinguishes PLTQ's fraud claim, however, on the ground that, as to it fraud claim, PLTQ sought to recover "for a category of damages that was distinctly different from the contract damages," including "[m]oney used without [its] knowledge or consent and not for [its] direct or indirect benefit." *Id.* The majority cites "undocumented expenses related to phantom tenants" and money "diverted to Yu's development at Stonegate" as examples of fraudulent draws not authorized by the Royal Oaks Development Agreement. Slip Op. at 31. Draws for expenses related to tenants and Yu's Development Fee, which he was free to "divert" to other projects or to spend in any other way, were, however, both economic losses due to breach of duties created under the Development Agreement. *See Sharyland*, 354 S.W.3d at 417. This evidence, together with the other evidence and jury findings cited below, refutes, rather than supports, the jury's finding that PLTQ

29

suffered damages in fraud separate from economic loss to the subject of the contract.

PLTQ expressly agreed in writing to all of the fees and expenses charged against it. Its claim that it knew nothing about specific draws and was therefore defrauded is contradicted by its own signed agreements and will not support fraud damages. The Amendment specifically provided that PGI was authorized by PLTQ "to pay from [the disbursement account with Metro Bank] (or any replacement account) any and all costs and expenses . . . including, without limitation, the Development Fee. . . ." Nguyen testified that he wanted the Development Fee included in the construction loan, and Yu also testified that Nguyen wanted him to take the Development Fee from the construction loan because Nguyen felt the Development Fee was part of the total cost of construction. The parties did not alter or amend this agreement between them after they discovered that Metro Bank would not permit payment of the Development Fee from the construction loan funds.

Moreover, the jury expressly found that the Developers did *not* fraudulently induce PLTQ to enter the Royal Oaks Development Agreement. And it expressly found *no* damages as to "[m]oney withdrawn from the Royal Oaks construction loan that PLTQ would not have had to pay had the agreement been performed." That is, the jury found that *all* of PLTQ's losses consisted of money it would have

30

had to pay under the terms of the agreement if the agreement had been performed. *All* of PLTQ's damages were contract damages. And, indeed, the evidence demonstrates that the money withdrawn from the construction loan was all money that PLTQ owed under the Royal Oaks Development Agreement as construction costs, the Development Fee, or other contractually assigned costs.

Thus, there is literally no evidence of any damages attributable to fraudulent misrepresentations by the Developers separate from damages for breach of the Royal Oaks Development Agreement. The only losses to PLTQ identified as losses either for breach or for fraud are due to the failure of the Project to achieve the economic success hoped for by both Yu and Nguyen and the need for additional funds—agreed to by PLTQ—to finish the Project.

Accordingly, I disagree with the majority's holding that the economic loss rule does not apply. Slip Op. at 32. And I further disagree with its reliance on *Sharyland* as support for its ruling on the ground that the Developers breached a fiduciary duty to PLTQ. *See id.* at 32–33 (citing 354 S.W.3d at 418 for proposition that "economic losses are recoverable for breach of fiduciary duty"). *Sharyland*'s holding that damages were available to the plaintiff both in contract and in tort was predicated on the defendant's breach of fiduciary duty. The Royal Oaks Development Agreement II was an arm's length transaction between sophisticated businessmen, as acknowledged in the agreement itself, and the trial court entered

31

an unchallenged directed verdict rejecting PLTQ's allegations of breach of fiduciary duty.

I would hold that the economic loss rule bars PLTQ's fraud claims and that the trial court erred in denying the Developers' motion for JNOV on those claims. Therefore, I would sustain the Developers' third issue.

**Election of Remedies**

In their fourth issue, the Developers argue that if PLTQ's fraud claim is not barred by the economic loss rule, then PLTQ should have been required to elect a remedy as between the contract and fraud damages awarded by the jury. I would hold that this issue is moot.

A party is entitled to sue and seek damages on alternative theories, but it is not entitled to a double recovery. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998); *Madison v. Williamson*, 241 S.W.3d 145, 158 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). "If a plaintiff pleads alternate theories of liability, a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory." *Madison*, 241 S.W.3d at 158; *see Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987). "Under the one-satisfaction rule, [however,] a plaintiff is entitled to only one recovery for any damages suffered because of a

32

particular injury." *Utts v. Short*, 81 S.W.3d 822, 831 (Tex. 2002) (Baker, J., concurring); *accord Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991); *Madison*, 241 S.W.3d at 158–59.

"Although the traditional 'one satisfaction' principle applies to cases in which an injured plaintiff is wholly compensated by settling defendants or other third parties," the Texas Supreme Court has also used the term "to describe the process by which the trial court elects the remedy which affords an injured plaintiff the most favorable relief against a single defendant when multiple theories of liability cause an indivisible injury." *Madison*, 241 S.W.3d at 158–59; *compare Utts*, 81 S.W.3d at 831, *and Sterling*, 822 S.W.2d at 5–6 (analyzing one-satisfaction rule in context of plaintiff's compensation from settling defendant or other third party) *with Chapa*, 212 S.W.3d at 303 (analyzing one-satisfaction rule in context of election of remedies). "The latter rule applies when a defendant commits technically different acts that result in a single injury." *Madison*, 241 S.W.3d at 159 (citing *Casteel*, 22 S.W.3d at 390 and *Emerson Elec. Co. v. Am. Permanent Ware Co.*, 201 S.W.3d 301, 314 (Tex. App.—Dallas 2006, no pet.)). Thus, under the one satisfaction rule, when multiple theories of liability cause an indivisible injury, an injured party must elect the remedy which affords it the most

33

favorable relief. *See Chapa*, 212 S.W.3d at 304–05; *Madison*, 241 S.W.3d at 158–59.

I would hold that the economic loss rule bars PLTQ's fraud claims and therefore the election of remedies issue is moot. However, if it were not, I would hold that the trial court erred by failing to require PLTQ to elect a remedy.

**Sufficiency of the Evidence to Support Award of Lost Tenant Rent**

In their fifth issue, the Developers argue that the trial court erred by not granting their motion for JNOV as to $136,021 of the jury's award of contract damages on lost tenant rent. They argue that these damages were speculative because the Royal Oaks Project was a new enterprise and had no established track record; thus, there was no evidence from which the lost profits could be estimated. I agree with the Developers.

To recover compensatory damages for breach of contract, a plaintiff must show that it suffered a pecuniary loss as a result of the breach. *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 324 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). To recover lost profit damages, a plaintiff must show the loss by competent evidence and with reasonable certainty. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (citing *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)); *Tex. Instruments, Inc. v. Teletron Energy Mgmt, Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). Compensatory damages

34

"must be the natural, probable, and foreseeable consequence of the defendant's conduct." *S. Elec. Servs.*, 355 S.W.3d at 324. A plaintiff may not recover breach-of-contract damages "if those damages are remote, contingent, speculative, or conjectural." *Id.* at 324. Nor may the plaintiff recover lost-profit damages "where the enterprise is new and unestablished. . . ." *Tex. Instruments*, 877 S.W.2d at 279. "Thus, the absence of a causal connection between the alleged breach and the damages sought will preclude recovery." *S. Elec. Servs.*, 355 S.W.3d at 324. The supreme court has explained the law:

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

*Tex. Instruments*, 877 S.W.2d at 279.

Factors to be considered in determining lost profits are: (1) the experience of the persons involved in the enterprise; (2) the nature of the business activity; and (3) the relevant market. *Id.* at 280. "The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits." *Id.* "Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost-business activity, less expenses that would have been attributable to that activity." *Kellmann v. Workstation*

*Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (citing *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002)). "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus.*, 835 S.W.2d at 84. "As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.* Lost profits cannot be based on pure speculation or wishful thinking. *Tex. Instruments*, 877 S.W.2d at 279–80.

Here, under the Royal Oaks Development Agreement, PGI was required to and did oversee leasing of the Project. However, disputes arose over the tenants PGI and Yu procured. PLTQ contended that the tenants that Yu found for the shopping center were unable to meet their obligations and that Yu's failure to find tenants who were able to pay the rent was a breach of contract. PLTQ sought lost tenant rents based on the difference between the rents in the leases secured by Yu and the Peterson Group and those for the replacement tenants later secured by Nguyen. The old and new leases were introduced into evidence at trial without objection. In addition, the jury had the actual leases from the tenants that Yu secured as a basis from which it could assess lost tenant rent damages. But PLTQ produced no other evidence to support its claim of lost tenant rents. Thus, there was no evidence to show that the profits to be gained from those leases after the

36

costs of the Project were subtracted were ever anything more than wishful thinking. Indeed, the objective facts, figures, and data affirmatively demonstrate the opposite. *See Holt Atherton Indus.*, 835 S.W.2d at 84 (stating that what constitutes reasonably certain evidence of lost profits is fact intensive determination that must be based on objective facts, figures, or data).

The data shows that, rather than accepting PGI's recommendations that would have satisfied requirements necessary to maintain the original leases, Nguyen began to take over from Yu the making of business decisions due to delays, disagreements over the proper way to proceed, and unexpected costs, including costs due to construction mistakes and build-out mistakes by the tenants themselves. When the parking lot was eight spaces short, PGI suggested a plan for creating more parking, but Nguyen instead canceled one of the restaurant's leases. Yu worked with the owner of the bar to devise a menu that would satisfy the TABC, which had refused a bar license, but Nguyen canceled that lease too.

After Yu left the Project due to Nguyen's overriding his decisions, Nguyen locked four tenants out of the center immediately prior to their taking occupancy of their newly completed spaces for failure to pay rent. Although some eventually returned, most of the original tenants either went out of business or had their leases terminated by Nguyen. No record of actual payment was introduced to show actual lost profits at the Project or the reasonable expectation of future profits; no

37

tabulation of expenses that PLTQ would have had to incur to make the leases viable was made and subtracted from profits; and no data was introduced to show the success of comparable projects in the area or comparable projects developed by Yu to suggest that the project was anything other than a highly speculative and untried enterprise.

The law is clear that "[t]he mere hope of success of an untried enterprise," as here, is not enough for recovery of lost profits. *See Tex. Instruments*, 877 S.W.2d at 280. I would hold, therefore, that the trial court erred in awarding PLTQ damages for lost profits, and I would sustain the Developers' fifth issue.

### Alter Ego

In their first issue, the Developers argue that the trial court erred by ruling that the Peterson Group and Yu were liable for breach of the Royal Oaks Development Agreement as alter egos of PGI. The Developers argue that the alter-ego theory of veil-piercing does not apply to limited partnerships. The majority agrees with the Developers. I disagree.

I would hold that PGI and the Peterson Group are both alter egos of Yu and of each other. The purpose and spirit of the alter ego statute cannot be evaded merely by forming an illusory, special purpose phantom entity in the form of a limited partnership, with an equally illusory corporation as its general partner, to shield another corporate entity and an individual from liability for their actions

under a contract they procured and would be obligated to perform in their own name had not illusory corporate and limited partnership entities been formed.

Business Organization Code section 21.223, governing the liability of corporations under an alter-ego theory,[1] provides, in relevant part:

> (a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to
>
> . . . .
>
> > (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or similar theory;
>
> . . . .
>
> (b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber or affiliate caused the corporation to be used for the purpose of

---

[1] I note that the Texas Business Corporation Act expired effective January 1, 2010 and was replaced by the Texas Business Organizations Code. *See* Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 595. The provisions of the Business Organizations Code did not apply until January 1, 2010 to entities formed before January 1, 2006, such as the entities in this case, unless the entity elected early adoption. *Anderson Petro-Equip., Inc. v. State*, 317 S.W.3d 812, 816 n.2 (Tex. App.—Austin 2010, pet. denied). Nothing in the record indicates that the entities here elected early adoption. However, because there is no substantive difference between the relevant provisions of the Business Corporation Act and the Business Organization Code, I cite the current statute. *See id.*

perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

TEX. BUS. ORGS. CODE ANN. § 21.223(a)(2),(b) (Vernon 2012). "Actual fraud involves dishonesty of purpose or intent to deceive." *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387–89 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (construing predecessor statute to section 21.223(b) and holding that owner of corporation that solicited corporate sponsorship for clients was not its owner's alter ego for purposes of that provision absent evidence that owner enjoyed direct personal benefits resulting from fraud).

This Court has previously addressed the proper construction of Business Organizations Code section 21.223(a)(b):

> "The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations. . . ." *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986); *see* [*SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 451 n.29 (Tex. 2008)]. However, the corporate veil may be pierced on an alter-ego theory "where a corporation is organized and operated as a mere tool or business conduit of another. . . ." *Castleberry*, 721 S.W.2d at 272. "Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Id.* "It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Id.*

40

*Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st

Dist.] 2012, pet. dism'd).  We further explained:

> To pierce the corporate veil and impose liability under an alter ego
> theory of liability pursuant to *SSP Partners*, a plaintiff must show:
> (1) that the persons or entities on whom he seeks to impose liability
> are alter egos of the debtor, and (2) that the corporate fiction was used
> for an illegitimate purpose, in satisfaction of the requirements of
> article 2.21 [of the Business Corporations Act]—now Business
> Organizations Code section 21.223(a) and (b).
>
> To satisfy the first consideration in piercing the corporate
> veil—whether the persons or entities sought to be charged with
> liability are alter egos of the primary debtor—the relationship between
> corporate entities can be assessed using factors such as:
>
> - whether the entities shared a common business name, common
>   offices, common employees, or centralized accounting;
>
> - whether one entity paid the wages of the other entity's
>   employees;
>
> - whether one entity's employees rendered services on behalf of
>   the other entity;
>
> - whether one entity made undocumented transfers of funds to
>   the other entity; and
>
> - whether the allocation of profits and losses between the entities
>   is unclear.

*Id.* at 508–09 (internal citations to *SSP Partners*, 275 S.W.3d at 450–51, 456 &

n.57, omitted).

We also held, however,

> The foregoing factors "are almost entirely irrelevant" to the second
> consideration in determining personal liability under section 21.223—

41

whether the use of limited liability was illegitimate. [*SSP Partners*, 275 S.W.3d at 455.] That determination is made "based on a careful evaluation of the policies supporting the principle of limited liability." *Id.* Therefore, we must look to *SSP Partners* and *Castleberry* to see whether the corporate fiction was used as a means of "perpetrat[ing] an actual fraud on the obligee . . . primarily for the direct personal benefit of the . . . owner[s]" of [the two defendant entities]. TEX. BUS. ORG. CODE ANN. § 21.223(b).

The supreme court observed in *SSP Partners* that courts "disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." 275 S.W.3d at 454. Specifically, courts disregard the corporate fiction

(1) when the fiction is used as a means of perpetrating fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4) where the corporate fiction is employed to achieve or perpetrate monopoly;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

*Id*. (quoting *Castleberry*, 721 S.W.2d at 271–72). "Because disregarding the corporate fiction is an equitable doctrine, Texas takes a flexible fact-specific approach focusing on equity" in determining whether the corporate veil should be pierced. *Castleberry*, 721 S.W.2d at 273; *see also Wilson v. Davis*, 305 S.W.3d 57, 69 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

*Id.* at 509–10.

42

There is, therefore, a two-pronged test that must be satisfied before a creditor may pierce the corporate veil and hold a attach liability to person or entity as the alter ego of another: (1) that the persons or entities on whom he seeks to impose liability are alter egos of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose. *See id.* at 508–10. I would hold that the test was satisfied here.

### 1. Relationship of corporate entities and limited partnership

Here, it is clear that alter-ego theory applies, and thus the first prong of the test for piercing the corporate veil is satisfied, in that there is such unity between the limited partnership, PGI, its corporate general partner, Peterson I Realty, the Peterson Group, and Yu that the separateness of the limited partnership and its corporate general partner "has ceased and holding only the corporation liable would result in injustice." *See id.* at 508 (quoting *Castleberry*, 721 S.W.2d at 272). Likewise, that alter-ego theory applies is evident from the "total dealings" of the limited partnership, its corporate general partner, the Peterson Group, and Yu, "including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *See id.*

43

The Peterson Group, PGI, and Peterson I Realty all shared closely related business names; they shared the Peterson Group's office; and they had only one employee, Yu, the president of both Peterson I Realty and the Peterson Group. PGI had no bank account, and Tan's testimony established that the construction contract was with the Peterson Group. Indeed, the original development agreement was signed by Yu as president of the Peterson Group and was then superseded the next day by the Royal Oaks Development Agreement—a more detailed agreement covering the same matters—which was executed by Yu as the president and sole shareholder of the general partner of PGI, Peterson I Realty. The later agreement, into which the first was expressly merged, contained a clause limiting liability on the contract to PGI, a special purpose entity formed solely for performing the Agreement, just as its general partner was formed solely to execute the Agreement. Neither had any assets or existence apart from Yu and the Peterson Group. Although PLTQ was listed as the owner of the property on the construction contract with Tan, Tan's company, Atlantic Builder, and the Peterson Group were listed as the construction managers, and Tan testified that he thought he was working with the Peterson Group, as he had on other projects. There was also evidence of the commingling of funds and of funds drawn on the construction contract being used for the benefit of Yu and of the Peterson Group.

I would hold, therefore, that the relationship among PGI, Yu, and the Peterson Group, and also Peterson I Realty, was such as to make Yu and the Peterson Group alter egos of each other and of PGI under the factors for determining an alter-ego relationship set out in *SSP Partners*. *See* 275 S.W.3d. at 455–56; *see also Tryco*, 390 S.W.3d at 508–09.

### 2. *Formation of the limited partnership for an illegitimate purpose*

In addition, the evidence establishes that both Peterson I Realty and PGI were "used as part of a basically unfair device to achieve an inequitable result"— the limitation of liability to the assets of the phantom limited partnership—thereby satisfying the second prong of the test for piecing the corporate veil on an alter-ego theory. *See SSP Partners*, 275 S.W.3d at 454; *Tryco*, 390 S.W.3d at 510.

Both PGI and its corporate general partner, Peterson I Realty, were formed as special purpose entities immediately prior to commencement of construction for the Royal Oaks Project and for the purpose of serving as conduits for the performance of the development of the Project. PGI had no bank account or separate books, yet it was used as the vehicle for performing all of the Peterson Group's obligations under the Royal Oaks Development Agreement and for paying Yu's Development Fee for contractual services performed under the Agreement. Both Yu and the Peterson Group were shielded from liability for losses and damages due to the actions of the developer by the limitation of liability clause in

45

the Royal Oaks Development Agreement executed by Yu as president of Peterson I Realty.

I would hold, therefore, that both PGI and Peterson I Realty were organized and operated as mere tools or business conduits of another corporation, the Peterson Group, and of Yu, and for the illegitimate purpose of serving as the means for Yu's and the Peterson Group's avoiding liability for any breach of the Development Agreement. *See SSP Partners*, 275 S.W.3d at 454; *Castleberry*, 721 S.W.2d at 271–72; *Tryco*, 390 S.W.3d at 510.

Contrary to the arguments of the majority, the Business Organizations Code provisions governing limited partnerships clearly do not shield Yu from liability for the obligations of the limited partnership under the circumstances of this case, as is clear from the terms of the statute itself. A limited partner is subject to liability for partnership obligations if he is also a general partner or if, in addition to exercising a limited partner's rights and powers, he participates in the control of the business. TEX. BUS. ORGS. CODE ANN. § 153.102(a) (Vernon 2012); *Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499 (Tex. App.—Texarkana 2002, pet. denied). If the limited partner participates in the control of the business, he is liable to persons who transact business with the limited partnership reasonably believing, based on the limited partner's conduct,

that the limited partner is a general partner. TEX. BUS. ORGS. CODE ANN.

§ 153.102(b); *Pinebrook Props.*, 77 S.W.3d at 499.

Personal liability that attaches to a limited partner when he takes part in control of the business cannot be evaded merely by acting through a corporation. *Delaney v. Fidelity Lease Ltd.*, 526 S.W.2d 543, 545 (Tex. 1975). A limited partner who exercised control of the limited partnership as an officer of an alleged corporate general partner is not insulated from personal liability arising either from those activities or from those of the limited partnership. *Id.* at 545–56. When it is undisputed that the corporate general partner was organized solely to manage and control a limited partnership, the courts may disregard the corporate fiction as being used to circumvent a statute. *Id.* at 546. Moreover, a limited partnership can have more than one general partner. *Id.* The Texas Supreme Court has explained the justification for the rule:

> In no event should [individuals taking part in the control of the business in their individual capacities as well as their corporate capacities] be permitted to escape the statutory liability which would have devolved upon them if there had been no attempted interposition of the corporate shield against personal liability. Otherwise, the statutory requirement of at least one general partner with general liability in a limited partnership can be circumvented or vitiated by limited partners operating the partnership though a corporation with minimum capitalization and therefore minimum liability.

*Id.*; *see Pinebrook Props.*, 77 S.W.3d at 499–500) (holding that rule that alter ego does not apply to partnerships has been altered by statutory creation of limited

47

partnerships; that "a general partner in a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners"; that limited partner may also be general partner or participate in control of business and become liable to persons who transact business with limited partnership reasonably believing limited partner is general partner; and that alter ego can be used to pierce corporate veil of general partner of limited partnership, even when general partner is limited liability company).

The Royal Oaks Development Agreement, the contract on which the Peterson Group's and Yu's liability for fraud was based, was executed on behalf of PGI by Peterson I Realty, the general partner of PGI. Yu signed for Peterson I Realty as its president. All that separates PGI, a limited partnership, from either its sole limited partner, Yu, or its general partner, Peterson I Realty, is a certificate of limited partnership, which has nothing behind it, and Peterson I Realty's articles of incorporation, which have nothing behind them either. Nor does anything separate Yu from the Peterson Group except the Peterson Group's articles of incorporation, which, likewise, have nothing behind them.

There is no evidence that Yu formed PGI for any legitimate purpose. Rather, the un-rebutted evidence establishes that Yu, the sole employee of both PGI and the Peterson Group, a corporation, executed the Royal Oaks Development Agreement in his capacity as president of PGI's general partner, Peterson I Realty,

an entity specially formed for that purpose, just as PGI was specially formed to perform the services under the Agreement originally contracted to be performed by the Peterson Group. PGI and Peterson I Realty, to the extent either existed, worked through Yu from the only office Yu had—the office of the Peterson Group. Yu interacted as contractor for development of the Project with Tan, the architect, in an undefined capacity that Tan thought was that of the Peterson Group, with which he had worked before. Tan had never heard of PGI.

Because of the control he exercised over the activities of PGI, Yu, the sole limited partner of PGI and president and sole shareholder of is corporate general partner, Peterson I Realty, can clearly be held liable for the debts of PGI under the express language of section 153.102(b). *See* TEX. BUS. ORGS. CODE ANN. § 153.102(b) (providing that if limited partner participates in control of business, he is liable to person who transacts business with limited partnership reasonably believing, on basis of his conduct, that limited partner is general partner). The question, then, is whether PLTQ can reach the assets of the Peterson Group— which was not a party to the Royal Oaks Development Agreement—through Yu and the Peterson Group as alter egos of PGI and of each other to collect a judgment for breach of the Development Agreement. I would hold that it can on the basis of the facts recited above.

49

I would hold that PGI was an alter ego of both the Peterson Group and Yu and that it was formed for an illegitimate purpose. Thus the corporate veil can be pierced and the Peterson Group and Yu held liable for the judgment debt of PGI. Therefore, I would overrule the Developers' first issue.

## Attorney's Fees

In their second issue, the Developers contend that the trial court erred by ruling that the Peterson Group and Yu were responsible for attorney's fees. Specifically, the Developers argue that the Peterson Group and Yu cannot be held liable as alter egos of PGI for attorney's fees awarded on PLTQ's cause of action for breach of the Development Agreement. And they argue that PLTQ is not entitled to recover contractual attorney's fees under the "prevailing party" provision in the Stonegate Contract since it pleaded only statutory attorney's fees allowed by Civil Practice and Remedies Code section 38.001 for breach of contract. PLTQ responds that the award is proper under section 38.001; it prevailed at trial; its claims are all inextricably intertwined; and the parties stipulated as to the amount of attorney's fees to be awarded; therefore, PLTQ is entitled to all attorney's fees awarded to it. I would affirm the award of attorney's fees to PLTQ.

PLTQ sought attorney's fees under Civil Practice and Remedies Code section 38.001 on its cause of action for breach of contract, including both breach

50

of the Royal Oaks Development Agreement and the assertion of a successful affirmative defense on the Stonegate Contract, as well as the ancillary services rendered on proving alter ego. *See* TEX. CIV. PRAC. & REM. CODE § 38.001 (Vernon 2012) (providing for recovery of attorney's fees on successful contract claim).

On appeal, PLTQ contends that it is entitled to recover the amount of attorney's fees awarded to it from the Peterson Group not only because recovery of attorney's fees for breach of contract is permitted by section 38.001, but because the parties stipulated at trial as to the amount of attorney's fees it incurred, and because a clause in the Stonegate Contract provided for an award of attorney's fees in a suit to enforce or interpret the contract:

> 11.15. Attorney's Fees. If any action at law or in equity becomes necessary to enforce or interpret any term, provision or condition of this Contract, the prevailing party shall be entitled to recover the reasonable attorney's fees, costs, and necessary disbursements (including, but not limited to, expert witness fees and deposition costs) incurred or made by it in addition to any other relief to which it may become entitled.

The Peterson Group and Yu argue that they are not liable for attorney's fees at all, but, if they are, the attorney's fees award was improper because of the failure to segregate.

"As a general rule, litigants in Texas are responsible for their own attorney's fees and expenses in litigation." *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401

S.W.3d 35, 41 (Tex. 2012). Under Texas law, a court may award attorney's fees only when authorized by statute or by the parties' contract. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). Whether a party is entitled to seek an award of attorney's fees is a question of law that we review de novo. *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999).

Civil Practice and Remedies Code section 38.001 provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." TEX. CIV. PRAC. & REM. CODE. ANN. § 38.001(8). To obtain an award of attorney's fees under section 38.001, "a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).

In addition, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). When parties include an attorney's fee provision in a contract, the language of the contract controls rather than the language of the statute. *Id.* at 654–56 (reviewing definition of "prevailing party" under contract to determine whether plaintiff who had not recovered any actual damages was entitled to recover attorney's fees). Thus, a party who successfully defends a breach of contract claim but does not recover damages

52

might be entitled to attorney's fees under a contractual provision even though he would not be entitled to attorney's fees under Chapter 38. *See Robbins v. Capozzi*, 100 S.W.3d 18, 26–27 (Tex. App.—Tyler 2002, no pet.); *Weng Enters., Inc. v. Embassy World Travel, Inc.*, 837 S.W.2d 217, 222–23 (Tex. App.—Houston [1st Dist.] 1992, no writ); *Silver Lion, Inc. v. Dolphin St., Inc.*, No. 01–07–00370–CV, 2010 WL 2025749, at *17–18 (Tex. App.—Houston [1st Dist.] May 20, 2010, pet. denied) (mem. op). However, in light of the difference in application of statutory and contractual attorney's fees, and because a court's judgment must conform to the pleadings, a party who pleads for attorney's fees only under Chapter 38 waives its claim for attorney's fees under a contractual provision. *See Intercontinental Grp. P'ship*, 295 S.W.3d at 659; *see also* TEX. R. CIV. P. 301 (providing that court's judgment shall conform to pleadings).

Here, in its live pleading at trial, PLTQ pleaded only for reasonable attorney's fees under Chapter 38. It did not plead for attorney's fees under the "prevailing party" provision of the Stonegate Contract. PLTQ first raised this theory of recovery in a post-trial motion to amend its pleadings that was not ruled upon by the trial court, and PLTQ did not file amended pleadings to support its claim.

I agree with the majority that the judgment awarding attorney's fees against the Peterson Group and Yu cannot be supported on the basis of the contractual

53

attorney's fees provision in the Stonegate Contract. *See* TEX. R. CIV. P. 301 (stating that judgment must conform to pleadings); *Intercontinental Grp. P'ship*, 295 S.W.3d at 659 (holding that party waived its right to recover attorney's fees under contractual provision by pleading for attorney's fees only under Chapter 38); *see also Stoner v. Thompson*, 578 S.W.2d 679, 682–83 (Tex. 1979) (holding that party may not be granted relief in the absence of pleadings to support that relief). I would hold, therefore, that the trial court did not err by failing to award attorney's fees under the "prevailing party" provision in the Stonegate Contract, even if this issue had not been waived.

The majority, however, goes on to find no basis for awarding attorneys' fees under Civil Practice and Remedies Code section 38.001. I would affirm the award.

PLTQ was clearly entitled to recover attorney's fees for its contract claims, but not their fraud claims, under section 38.001—the provision under which it sought attorney's fees at trial. However, the Texas Supreme Court has held that "when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Chapa*, 212 S.W.3d at 313 (quoting *Sterling*, 822 S.W.2d at 11–12). It further held that "[i]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not

54

be segregated and the party suing for attorney's fees may recover the entire amount. *Id.* at 313–14.

Here, as discussed above, PLTQ's fraud claims were so inextricably intertwined with its breach of contract claims as to render fraud damages unrecoverable under the economic loss rule. Thus, I would hold that the rule in *Chapa* applies, and the entire amount of attorneys' fees sought was properly awarded under section 38.001.

Moreover, the parties stipulated as to the amount properly recoverable on the case. A stipulation is construed as a type of contract between the parties and between the parties and the Court. *First Nat'l Bank v. Kinabrew*, 589 S.W.2d 137, 142–43 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.). Stipulations are generally favored by the courts and are binding on the parties. *Amoco Prod. Co. v. Tex. Elec. Serv. Co.*, 614 S.W.2d 194, 196 (Tex. Civ. App.—Houston [14th Dist.] 1981, no writ).

For the foregoing reasons, I would overrule the Developers' second issue and affirm the trial court's award of attorney's fees to PLTQ.

## Conclusion

I would affirm that part of the trial court's final judgment holding that the Peterson Group and Yu are alter egos of PGI and of each other. I would further hold that PLTQ's fraud claim is barred by the economic loss rule; and, therefore, I would reverse the trial court's judgment awarding PLTQ damages for fraud and would declare that it take nothing by that claim. I would also reverse the trial court's judgment awarding PLTQ damages for lost profits, but I would otherwise affirm the award of damages for breach of the Royal Oaks Development Agreement against the Peterson Group, PGI, and Yu. I would affirm the trial court's award of attorney's fees to PLTQ. Finally, I would remand the case to the trial court for calculation of pre- and post-judgment interest and for further proceedings consistent with this opinion.


Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Keyes, dissenting.

56